## A05A2120. BLACKWOOD v. THE STATE.
### (627 SE2d 907)

ADAMS, Judge.

Jacob W. Blackwood appeals from his conviction on one count of trafficking in methamphetamine. We affirm.

1. Blackwood first argues that the state failed to prove that he was guilty of trafficking in methamphetamine because there was no evidence that he had authority or control over either the methamphetamine or the drug transaction. Further, he asserts that the state failed to prove the weight of the methamphetamine sold to Agent King as required by the trafficking statute and contends that the trial court erred in directing a verdict on this ground.

"The standard for reviewing the denial of a motion for a directed verdict of acquittal and for considering the sufficiency of the evidence is the same. We view the evidence in the light most favorable to the verdict, and [Blackwood] no longer enjoys the presumption of innocence." (Footnotes omitted.) *Ellzey v. State*, 272 Ga. App. 253, 258 (2) (612 SE2d 77) (2005). "And as long as there is some competent evidence, even though contradicted, to support each fact necessary

---

for the state's case, the jury's verdict will be upheld." (Footnote omitted.) *Goodrum v. State,* 269 Ga. App. 397, 401 (3) (604 SE2d 251) (2004).

So viewed, the evidence shows that in May 2002 Carla King, an agent with the Georgia Bureau of Investigation ("GBI"), was assisting the West Georgia Drug Task Force in making undercover narcotic purchases. In that capacity, Agent King made several undercover purchases of methamphetamine from Jody Ballew during May 2002. On May 29, she called Ballew to try to set up another purchase of methamphetamine. Ballew returned the call on May 31, and they arranged to meet later that day along with James Clark at Ballew's house, where the plan was for King to purchase 1 1/4 ounces of methamphetamine for $1,300.

When King arrived at the house, accompanied by another GBI undercover agent, Ballew and Blackwood were in the front yard. The agents were introduced to Clark, and Ballew and Blackwood left for about 20 minutes, saying they were going to the store. Although Agent King did not know where they went, she testified that in her experience, participants in a drug sale may, as a precaution, leave for a short period to see if there are any police officers in the area monitoring the sale.

After Ballew and Blackwood left, the agents went inside the house with Clark and spent time talking in the kitchen. Agent King got the impression that Clark was stalling. During this time, Clark received a phone call but Agent King did not know who called him. After the agent asked about buying drugs, Clark led her into a small bathroom where he placed a block of methamphetamine on the counter. Agent King estimated that the block weighed approximately three to four ounces. Clark began cutting the block with a pocket-knife, but had some difficulty because the block was quite hard.

When Ballew and Blackwood returned to the house, Blackwood came into the bathroom and began to assist Clark. After he arrived, Clark laid out four lines of the drug and invited the agents and Blackwood to "snort" a line with him. The agents declined and no one sampled the drug at that time. While Clark continued cutting, Blackwood helped weigh the drug, using a scale furnished by the GBI agents. He also helped put the drug in bags. Agent King said the two acted "like partners . . . just kind of helping each other with the transaction." Blackwood would weigh the drug cut by Clark, take it off the scale and Clark would add more methamphetamine, then Blackwood would put it back on the scale. Agent King said she spoke more with Blackwood than with Clark during the transaction, including discussions of the drug and how to bag and weigh it. The weighing process continued until they got the correct amount. Clark then scraped the untouched lines of methamphetamine into the bags,

and they tied it into two corner baggies. Clark and Blackwood used two baggies because the drug would not fit into one.

Afterward, Agent King paid Clark for the methamphetamine. Clark counted the money three times, as Blackwood stood by, and then laid it on the counter beside the large block of methamphetamine. Clark put the baggies into a cigarette box and handed it to King. She began to negotiate another transaction with Clark, but Blackwood did not participate in these negotiations. After the agents returned to their car, Agent King performed a field test on the methamphetamine and put the bags containing the drug into an evidence bag.

Deneen Elizabeth Scott, a GBI forensic chemist, testified that she analyzed the material purchased by Agent King and determined that it weighed a total of 32.64 grams and tested positive for methamphetamine.

Clark testified for the defense, stating that Blackwood had no knowledge of the proposed drug transaction when he accompanied Clark to Ballew's house that day. Blackwood did not participate in acquiring the drugs for sale or in negotiating the transaction. While Ballew and Blackwood were at the store, Clark initiated the drug transaction with Agent King. When Blackwood got back, he walked into the middle of the transaction. He said that Blackwood merely took the methamphetamine that Clark cut for him, but had nothing to do with the drug transaction with Agent King. He said Blackwood looked "kind of surprised" when he saw the amount of methamphetamine in the bathroom. Clark also said that Blackwood did not assist in putting the methamphetamine into bags; he was not there when the money was exchanged; and he did not receive any money from the transaction. He said that Blackwood's involvement with the scales consisted of suggesting a trick that Agent King might use "to get over on somebody," but he never touched the scales.

We find that the evidence was sufficient to sustain Blackwood's trafficking conviction. Any person who "knowingly sells, delivers, or brings into this state or has possession of 28 grams or more of methamphetamine . . . commits the felony offense of trafficking in methamphetamine. . . ." OCGA § 16-13-31 (e). The evidence clearly established the sale of more than 28 grams of methamphetamine. Although Blackwood argues that the state failed to prove how much methamphetamine was actually weighed at the time of the sale, that fact is irrelevant. The state showed that Agent King paid $1,300 and in exchange received 32.64 grams of methamphetamine, which is sufficient to meet the requirements of the statute. Thus, the trial court did not err in denying Blackwood's motion for directed verdict on this ground.

Blackwood also argues that the state failed to show that he either possessed or sold the methamphetamine as required by the trafficking statute. He notes that there was no evidence that he either arranged the sale or received any money in connection with the purchase. But "[u]nder OCGA § 16-2-21, one who intentionally aids and abets in the commission of a crime is a party to the crime and may be convicted of the commission of the crime." *Granados v. State*, 244 Ga. App. 153, 154 (1) (534 SE2d 886) (2000). "While mere presence at the scene of the commission of a crime is not sufficient evidence to convict one of being a party thereto, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." (Citation and punctuation omitted.) *Murphy v. State*, 272 Ga. App. 287, 290 (2) (612 SE2d 104) (2005). Although a person will not be presumed to act with criminal intent, the trier of fact "may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." (Footnote omitted.) *Brown v. State*, 245 Ga. App. 706, 708 (538 SE2d 788) (2000).

The state presented evidence that when Blackwood returned to the house, he jumped into the middle of the sale, working in concert with Clark to weigh and bag the methamphetamine for purchase. Although Clark testified that Blackwood had no prior knowledge of or participation in the sale, the jury was not required to believe his testimony. *Goodrum v. State*, 269 Ga. App. at 402 (3). Accordingly, we find that the state presented sufficient evidence to sustain Blackwood's conviction for trafficking in methamphetamine. See *Granados v. State*, 244 Ga. App. at 153-154 (1); *Height v. State*, 221 Ga. App. 647, 647-648 (1) (472 SE2d 485) (1996); *Gay v. State*, 221 Ga. App. 263, 264-265 (1) (a) (471 SE2d 49) (1996).

2. Blackwood also contends that the trial court erred in denying his motion for directed verdict on the ground that the district attorney's office destroyed an audiotaped recording of the drug transaction. An evidence custodian with the Carroll County Sheriff's Department testified that he was contacted by the district attorney's office and asked to destroy numerous audio and videotapes, including the audio recording at issue and a separate videotape related to this incident. After the custodian destroyed the audiotape, he received word that the direction to destroy these tapes had been a mistake, and the videotape was preserved. The videotape was returned to the district attorney's office and was played at trial, although the video was shot from the agents' car and did not show the actual drug transaction.

"The State has a constitutional obligation to preserve evidence that might be expected to play a significant role in the suspect's

defense." (Footnote omitted.) *Giraudy v. State*, 252 Ga. App. 219, 220 (1) (555 SE2d 874) (2001). But "the failure to preserve evidence does not constitute a constitutional violation, unless it is shown that the missing evidence was potentially useful to the defense and was destroyed in bad faith on the part of the police. *Arizona v. Youngblood*, 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988)." *Dixon v. State*, 275 Ga. 232, 233 (4) (564 SE2d 198) (2002). Accordingly, "the prosecution may be penalized if it loses or destroys evidence that could potentially have been helpful to the defense [only] if the defense shows that the evidence was material and that the State acted in bad faith in failing to preserve it." (Punctuation and footnote omitted.) *Giraudy v. State*, 252 Ga. App. at 220 (1). "To be material, the evidence must have had an apparent exculpatory value before it was lost, and be of such a nature that the defendant cannot obtain comparable evidence by other reasonable means." (Citations omitted.) *Hannah v. State*, 278 Ga. 195, 198 (3) (599 SE2d 177) (2004).

While an audiotape may have apparent exculpatory value under certain circumstances, Blackwood has failed to establish that the tape in this case had such value. He presented no evidence as to whether anyone had ever listened to the tape or whether it was even audible. Moreover, the audiotape would only have recorded what was said during the transaction. Blackwood's defense hinged on Clark's testimony that Blackwood had no prior knowledge of the drug transaction; that Blackwood looked "kind of" surprised when he saw the amount of methamphetamine in the bathroom; and that he did not touch the scales or assist in bagging the drugs. But Blackwood fails to show how the audiotape would have conveyed to the jury either his expression when he entered the bathroom or whether he was touching the scales and bagging methamphetamine during the transaction. Nor did Blackwood establish any bad faith on the state's part in destroying this evidence.

Accordingly, we find no error in the trial court's denial of a directed verdict on this ground. "[W]e cannot say that the State's failure to turn [the audiotape over to Blackwood] caused him the kind of prejudice that undermined confidence in the outcome of the trial or which created a reasonable doubt of guilt which did not otherwise exist." (Citations omitted.) *Ely v. State*, 275 Ga. App. 708, 711 (1) (a) (621 SE2d 811) (2005).

3. Blackwood also contends that the trial court erred in denying his motion for a mistrial based upon the actions of one of the jurors at his trial.

At one point during the jury deliberations, Juror Rashonda Chism requested that she be excused from the jury. She told the judge that everyone in the jury room "has one decision and I'm the only one with a different decision and I just can't at this point say yea or nay.

I don't think that there is enough evidence to convict this guy of trafficking. I wouldn't feel good tonight if I said he was guilty." In response, the trial judge stated, "We will have you go back to the jury room and continue your work as a juror."

A short time later, the jury returned a guilty verdict, and the clerk of court polled the jury. When Juror Chism was asked whether the guilty verdict was her verdict in the jury room, she responded, "No, sir." The trial judge questioned Juror Chism further:

> The Court: This was not your verdict in the jury room?
> Juror Chism: Not initially, but it is now.
> The Court: Did you give this verdict — let me read you the verdict again. The State of Georgia versus Jacob W. Blackwood. We, the jury find the Defendant Jacob W. Blackwood guilty of the offense of violation of [the] Georgia Controlled Substances Act trafficking methamphetamine. Was this your verdict in the jury room?
> Juror Chism: Yes, sir.
> The Court: Is this still your verdict?
> Juror Chism: Yes, sir.
> The Court: Was it freely and voluntarily given?
> Juror Chism: Yes, sir.

Blackwood's trial counsel moved for a mistrial and asked for the opportunity to voir dire Juror Chism further. The trial court denied the motion.

As an initial matter, we find nothing improper or unduly coercive in the trial court's instruction to the juror that she continue her work as a juror. See *Jones v. State*, 273 Ga. 231, 234-235 (5) (539 SE2d 154) (2000); *Hector v. State*, 266 Ga. App. 80, 81-82 (2) (596 SE2d 189) (2004). Nor do we find any error in the trial court's conduct of the jury poll. "The object of [a jury] poll is to ascertain before the public and the prisoner that the verdict agreed upon in the jury room is still the unanimous verdict of the jury." (Citations omitted.) *Benefield v. State*, 278 Ga. 464, 465 (602 SE2d 631) (2004). Our Supreme Court has held that the minimum requirements of a jury poll are met by asking the questions, "Was that your verdict?" and "Is it now your verdict?" Id. Here, the trial court went beyond these minimum requirements in order to determine whether the verdict was unanimous. During this poll, Juror Chism affirmed on two separate occasions that the verdict was hers in the jury room. She also stated that the verdict was still hers and that it was freely and voluntarily given. Thus, the record shows that the verdict in this case was unanimous, and Blackwood's motion for a mistrial was properly denied. See *Hudson v. State*, 157 Ga. App. 71, 72-73 (3) (276 SE2d 122) (1981). "The indication of

'reservations' does not prevent the verdict from being unanimous. The requirement is that a juror agree to a verdict." (Citations and punctuation omitted.) *Rouse v. State*, 265 Ga. 32, 34 (3) (453 SE2d 30) (1995). See also *Scruggs v. State*, 181 Ga. App. 55, 56 (1) (351 SE2d 256) (1986) (even "reluctant agreement" in a jury verdict is sufficient).

4. Blackwood's remaining arguments assert that he received ineffective assistance of trial counsel. It appears from the record that Blackwood was represented by his trial counsel at the hearing on the motion for new trial and obtained new appellate counsel only after the trial court denied this motion. "Since the present appeal is the first occasion on which [Blackwood] could have raised the issue of trial counsel's ineffectiveness, the case must be remanded for an evidentiary hearing on this claim." (Citations omitted.) *Francis v. State*, 275 Ga. App. 164, 166 (2) (620 SE2d 431) (2005).

*Judgment affirmed in part and case remanded in part. Smith, P. J., and Ellington, J., concur.*

DECIDED MARCH 3, 2006.

*Bryman, Clerke & Kent, William H. Clerke IV*, for appellant.
*Peter J. Skandalakis, District Attorney, Anne C. Allen, Assistant District Attorney, Thurbert E. Baker, Attorney General*, for appellee.