**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**July 27, 2012**

# In the Court of Appeals of Georgia

A12A1623. WILLIAMS v. THE STATE.                              JE-062C

ELLINGTON, Chief Judge.

A Chatham County jury found Stacey Lamar Williams guilty beyond a reasonable doubt of two counts of aggravated assault with a deadly weapon, OCGA § 16-5-21 (a) (2), and two counts of possession of a firearm during the commission of a crime against another, OCGA § 16-11-106 (b) (1). He appeals from the denial of his motion for new trial, contending that the evidence was insufficient to support his convictions; that, during closing arguments, the prosecutor improperly commented on his constitutional right not to testify at trial; and that the trial court erred in denying his motions for a continuance and for a mistrial. For the following reasons, we affirm.

1. In contending that the evidence was insufficient to support his convictions, Williams argues that, although several witnesses testified at trial that he was the

person who shot the victims, those witnesses were not credible because they had had contact with and may have been influenced by "the State's star witness, Nicole Stevens."

When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). It is axiomatic that it is the function of the jury, not this Court, to determine the credibility of the witnesses, resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. Id.; see also OCGA § 24-9-80 ("The credibility of a witness is a matter to be determined by the jury under proper instructions from the court."). "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001). Viewed in this light, the record reveals the following facts.

After arriving home from work on September 17, 2007, a Chatham County resident, Nicole Stevens, learned that a girl who lived about two blocks away had been harassing her children earlier that day. According to Stevens, the girl's mother, "Tamira" (a.k.a. "Tammy"), had had a brief romantic affair with Stevens' husband about a year before; Tamira had also had a romantic relationship with Williams (the defendant). Stevens, accompanied by a few family members and two friends, walked to Tamira's house, and Stevens confronted Tamira about the on-going harassment of her family by Tamira and her daughter. The two women had a brief verbal and physical altercation; Tamira hit Stevens with a stick and threw bleach and grease on her. As Stevens and her supporters left Tamira's house, they saw Williams standing near the house with several other young men. Williams and some of the young men attacked members of Stevens' group, but none of the men appeared to have weapons. That fight ended quickly, but Williams and the other men followed Stevens and her supporters for a few minutes as they walked back toward her home.

About an hour and a half later, Stevens, some of her friends and family, and some of her neighbors were standing around outside of their homes when a few of the young men from the earlier altercation started taunting Stevens' nephew and a family friend, trying to engage them in another fight. Someone then shouted "bust

3

something," followed by "hit man, hit man, hit man." Williams suddenly appeared and started running down the street toward Stevens' home with a gun in his hand, shooting at Stevens, her home, and others. Williams shot Stevens' 16-year-old niece in the chest, severely wounding her. He also shot Stevens' mother as she was sitting on Stevens' porch with members of her bible study class. Williams then ran away.

Police officers and paramedics arrived minutes later, and the two victims were transported to the hospital, accompanied by Stevens. The officers interviewed Stevens and other witnesses who reported that they saw Williams holding and/or shooting a handgun at the victims and others while he ran down the street. In fact, one witness testified at trial as follows:

> I saw Stacey [Williams] on the corner of 53rd and Cedar. And I saw him pull out a gun, and I saw him – he started to shoot. Me and my mom was standing on the corner of 53rd and Cedar. And he started to shoot, and he was running up the street shooting. . . . [And] he started shooting towards our way. And then he moved the gun like towards going straight up the street.

In addition, Stevens' mother testified that, after she was shot, she saw Williams running past her home with a gun, but, at the time, she did not think he had shot her because she thought she knew him very well. She explained that Williams "ate at my

4

house. He called me grandma. He calls me mom. You know, I knew him." She also testified that, even though she did not think at that moment that Williams would harm her or her family or run down a street full of children while shooting a gun, she did not see anyone else with a gun. Further, another witness testified at trial that, although she did not see Williams actually holding a gun, she did see him running down the street with his arm extended while she heard gunshots, and she did not see anyone else with a gun. All of the witnesses who identified Williams by name to the police knew who he was and/or had seen him in the neighborhood before the shootings. In addition, at least three of the witnesses identified Williams as the shooter from a photographic lineup shortly after the shootings, and a few of the witnesses told the officers that Williams was wearing a green shirt with yellow or white markings at the time of the shootings.[1]

While interviewing witnesses and searching for evidence, the officers spoke to someone who had seen a black male run away from the crime scene and dump something in a trash can. The officers found a green and yellow shirt inside the trash can. They also found a Glock nine-millimeter semiautomatic pistol immersed in water at the bottom of a nearby trash can; the serial number on the pistol's barrel had been

---

[1] See Divisions 3 and 4, infra, regarding the green shirt.

5

painted over. In addition, the officers recovered a magazine for the weapon that contained seven live rounds of ammunition, as well as six shell casings that were scattered along the street where Williams had been running while shooting. Ballistic testing confirmed that the shell casings found at the scene had been fired from the Glock pistol found in the trash can.

On appeal, Williams argues that the witnesses who identified him as the shooter by name were not credible, because there was evidence that Stevens may have talked to some of them before they gave their statements to the police or before the trial. However, police officers interviewed two of the witnesses at the police station within an hour of the shootings, while Stevens was still at the hospital with the victims. Further, Williams' trial counsel had the opportunity to cross-examine each of those witnesses about their identification of Williams and whether Stevens had influenced them in any way, as well as to argue to the jury that Stevens was with two of the witnesses, both teenagers, before they gave their statements to the police and that she influenced those witnesses by "bolster[ing] the fact that [Williams was] the shooter." In addition, the trial court instructed the jury that they "must determine the credibility or believability of the witnesses"; that the identity of the assailant is a question of fact for them to determine and that such determination "is dependent upon the credibility

6

of the witness or the witnesses offered for that purpose"; and that, in determining the reliability of a witness' identification of the alleged perpetrator, they should consider, among other things, "whether the witness'[ ] identification may have been influenced by factors other than the view that the witness claimed to have, and whether the witness on any prior occasion did not identify the defendant in this case as the alleged perpetrator."

As noted above, the jury was solely responsible for determining the credibility of each witness, and, in so doing, considering whether their testimony was the product of their personal observations during the shootings or was the result of subsequent statements or other influence by Stevens. See *Martin-Argaw v. State*, 311 Ga. App. 609, 613 (2) (716 SE2d 737) (2011) ("[A]ny alleged inconsistencies in the evidence and issues of [the witnesses'] credibility were for the jury, not this Court, to resolve; and the jury obviously resolved those issues against [the defendant].") (punctuation and footnotes omitted). Thus, Williams cannot prevail on his argument that all of the witnesses who identified him as the shooter were so incredible that the jury's verdict cannot be sustained. Id. We conclude that the evidence presented, viewed in favor of the jury's verdict, was sufficient for rational jurors to find him guilty beyond a reasonable doubt of the crimes for which he was charged. See id. at 612 (1) (Evidence

7

showing that three victims were sitting together eating on an outdoor deck when the defendant rushed up and fired his gun toward them was sufficient to support his convictions for aggravated assault. "It is well settled that the act of firing a weapon into a group makes each individual in the group a separate victim and justifies a separate count of aggravated assault for each victim.") (punctuation and footnote omitted).

2. Williams contends that the prosecutor violated his constitutional and statutory rights when he improperly argued to the jury that, during deliberations, they should consider Williams' failure to testify in his own defense. As shown below, however, the record does not support this assertion.

During defense counsel's closing argument, he repeatedly argued that the State had failed to use certain evidence that had been collected at the crime scene to prove that Williams was involved in the shootings. He specifically mentioned that the State had failed to present hair extensions, a tennis shoe, and a crime scene video to prove its case.[2] He also told the jury to ask themselves during deliberations, "where is the green shirt[?]" In addition, he falsely argued that no one tried to get fingerprints off of the handgun, stating "[m]aybe they could have. Maybe they couldn't have. *They*

---

[2] See Division 3, infra, regarding this evidence.

*didn't even try. Didn't even try*. Had they tried and said they couldn't do it, . . . [t]hat's a different story. *They don't even try*. They know the shooter had the gun in his hand."[3] (Emphasis supplied.) Later, he argued, "If you had fingerprints from the gun, if you had DNA from the shirt, wouldn't that be helpful? . . . [W]ouldn't it have been helpful[,] instead of having a firearm examiner come in[,] to have the GBI fingerprint expert to come in or the GBI DNA expert to come in and talk to us about that evidence?" He stressed that "[t]he issue [to be decided] is not what gun fired the shots. The issue is who fired the shots. Now, *is [Williams'] life not worth the extra effort . . . to get this stuff examined so we don't have to go through all these different witnesses and then try to piece this case together piece by piece by piece*?" (Emphasis supplied.) Defense counsel also told the jury that the prosecutor might ask them, "why didn't the defense do this, why didn't the defense do that, he [(Williams)] could have done this, he could have done that[,]" then added the following statement:

> "Well, you know what? We don't have to. We're not required to. *That's [the State's] job, to prove [Williams] guilty. It's not my job to prove him innocent. Now, I'm doing the best I can to try to show you the problems with their case*[.] . . . I didn't indict this man. I didn't bring him before

---

[3] According to the officer who collected the evidence at the scene, Officer Alan Trammell, he tested the handgun and the magazine for fingerprints, but did not find any that could be used to identify the shooter.

you. They brought this case before you. They brought these charges against him."

(Emphasis supplied.) Finally, defense counsel talked to the jury about the trial court's upcoming instructions, stating that the court will instruct them

about [the] failure of the defendant to testify. *And she's going to tell you that he is not required to testify. The fact that he . . . does not testify, . . . you can't infer anything by the fact that he failed to testify.* And that's important because you people need to go home. You've been here all week. *And if you get back in that jury room, and you start talking about well, I thought the defendant would get up there and say something. I thought they'd call him as a witness. Why doesn't he explain what he's doing? Where was he? What was he doing? How come this, how come that, how come whatever?* You're going to end up being back there a whole lot longer than you need to be because *he's not required to testify. He's not required to prove his innocence. That's why he doesn't have to testify. You're to make no inference from that, and the [c]ourt's going to tell you that. That's the law.*[4]

(Emphasis supplied.)

The prosecutor then began her closing argument with the following observation:

---

[4] The record shows that the trial court did, in fact, instruct the jury on, inter alia, the presumption of the defendant's innocence, the State's burden of proof, and the principles that the defendant had no burden of proof and that his failure to testify at trial could not be considered against him.

10

I just heard for the past several minutes about everything that you don't have an answer to. We don't know about DNA. We don't know about the hair extensions. We don't know about fingerprints. We don't know this. We don't know that. But then you know what [Williams' counsel] said? He said but don't go back into that jury room and wonder why you didn't hear anything from him. Don't go back to the jury room and go where was [Williams]. We can't ask that. You can't ask things like that. He told you don't go, or you'll stay there all night. You don't have the answers to that because he isn't required to give them. But you don't have the answers. *And that's all I heard [Williams' counsel] talk about, was things you don't know.*

(Emphasis supplied.) The prosecutor immediately added, however, "Let's talk about what you do know. What do you know? You know all the evidence that came in up here." She then recounted the evidence presented that supported the State's case against Williams.

Although Williams claims that the prosecutor's statements were improper comments on his failure to testify, "[c]losing arguments are judged in the context in which they are made." (Punctuation and footnote omitted.) *Tucker v. State*, 313 Ga. App. 537, 540-541 (1) (b) (722 SE2d 139) (2012).

In determining whether a prosecutor has improperly commented on an accused's failure to testify, we must evaluate whether the prosecutor's manifest intention was to comment on the accused's failure to testify or

11

whether the remark was of such a character that a jury would naturally and necessarily take it to be a comment on the accused's failure to testify.

(Citation and punctuation omitted.) *Jennings v. State*, 282 Ga. 679, 681-682 (4) (653 SE2d 17) (2007).

Having reviewed the closing arguments in context, we conclude that the prosecutor's comments in this case do not satisfy either prong of that test. Instead, the comments simply restated defense counsel's assertions about alleged gaps in the State's proof, assertions that were immediately rebutted by the prosecutor when she reminded the jury of the volume of inculpatory evidence the State *did* present. Thus, "[i]t is apparent that the prosecutor was directly responding to the argument previously made by defense counsel, and there was no error in her doing so." (Footnote omitted.) *Tucker v. State*, 313 Ga. App. at 541 (1) (b).

3. Williams argues that the trial court erred in denying his motion for a continuance, which was based upon his counsel's alleged "newfound knowledge during the trial that a material piece of physical evidence was missing," specifically, the green shirt the officers discovered in the trash can. For the following reasons, this argument lacks merit.

It is undisputed that Williams' trial counsel participated in discovery and reviewed the State's entire file before trial. According to the prosecutor, in that file were e-mails between the State and Williams' former attorney regarding the green shirt, including one that said the shirt had been taken to the crime lab for DNA testing and that, if there was any DNA on the shirt that could be used for testing, the State would compare it to Williams' DNA. Then, during opening statements at trial, Williams' trial counsel told the jury that the State "failed to do any DNA testing on the shirt that was supposed to have been worn by the shooter. You're going to hear about this green and white polo shirt. *You may see it. I'm not sure.*" (Emphasis supplied.)

The State's first witness was Officer Alan Trammell of the Savannah Chatham Metropolitan Police Department forensics unit, who testified that he collected several pieces of evidence and took numerous photographs of the crime scene shortly after the shootings. He collected some hair extensions, a tennis shoe, and a green shirt that were found at the scene, and he placed the items, along with a crime scene videotape, in a bag that he sealed and logged into the department's evidence locker.[5] According to

---

[5] Officer Trammell also collected several other pieces of evidence, including the Glock nine-millimeter pistol, the magazine with seven live rounds of ammunition, and the six shell casings, and he logged the items into the evidence locker.

13

Officer Trammell, all of the physical evidence collected at the scene was taken to the state's crime lab for forensic testing. He testified, however, that he was not responsible for requesting DNA testing of the evidence. As he later explained, "[a]ll I do is log [the evidence] in. What's done with it after that is up to the detectives. I wouldn't search for DNA myself. [The detectives] might send it out to the lab to do that, but I wouldn't do that."

Pursuant to the State's request during direct examination, Officer Trammell opened the bag of evidence and described "everything" that was inside; he testified that the "the crime scene videotape, a tennis shoe, and some hair extensions" were inside the bag. The State tendered the items in the bag into evidence, and they were collectively admitted as State's Exhibit 6 without objection. Williams' trial counsel then cross-examined Officer Trammell about the items in the bag, as well as the other physical evidence and the photographs of the crime scene. At the end of the officer's testimony, the court excused him as a witness[6]; even though the prosecutor reminded the court and trial counsel that the officer was going to be leaving the state immediately, there was no objection to his being excused as a witness.

---

[6] The trial court specifically informed the prosecutor and trial counsel that it intended to excuse each witness after his or her testimony "unless I hear from one of you that you have further need of that witness."

14

Then, on the afternoon of the second day of trial, just before the State rested its case, the prosecutor and the defense counsel were reviewing the evidence that had been tendered thus far outside the presence of the jury when the prosecutor expressed concern that, although the State's Exhibit 6 listed a green shirt as being among its contents, the shirt was not, in fact, in the bag that had been tendered into evidence.[7] One of Williams' attorneys admitted, however, that Officer Trammell had specifically listed all of the items in the bag when the items were tendered into evidence as State's Exhibit 6 and admitted without objection the day before, so the fact that the shirt was missing had already been made part of the record. Even so, Williams' other attorney objected to State's Exhibit 6 at that point, arguing that he had been "under the impression" that the shirt was in the exhibit and that he had just, at that moment, become aware that the shirt had not been placed into evidence. After the court overruled his objection, Williams' counsel asked for a continuance until Officer Trammell returned the next week from an out-of-state trip so that he could cross-examine the officer about "what if anything he did with the green shirt." He characterized the shirt as a "material piece of evidence," arguing that "many witnesses have identified the shooter by that particular shirt" and that they "[c]ould not identify

---

[7] Three pictures of the shirt were tendered into evidence, however.

him by any other means but by the green shirt."[8] The court denied the request for a continuance.

"All applications for continuances are addressed to the sound legal discretion of the court and, if not expressly provided for, shall be granted or refused as the ends of justice may require." OCGA § 17-8-22. "In reviewing a trial court's denial of a motion for a continuance, this Court will not reverse a trial court's decision on a motion for continuance except upon a clear abuse of the trial court's discretion." (Punctuation and footnote omitted.) *Columbus v. State*, 270 Ga. 658, 665 (4) (513 SE2d 498) (1999). "Moreover, to be entitled to a new trial based upon the denial of his motion for a continuance, [the defendant has] the burden to show that he was harmed by that denial." (Footnote omitted.) Id.

In this case, Williams has failed to demonstrate that any prejudice resulted from the denial of his motion for a continuance, because he failed to present Officer Trammell as a witness or offer any other evidence in support of his motion for new trial[9] to show that his defense would have benefitted in any way by further questioning

---

[8] See Division 4, infra, regarding these inaccurate assertions.

[9] According to the trial court's order denying Williams' motion for new trial, at the scheduled hearing on the motion, both parties waived their opportunity to present evidence and stated that they wished to proceed on the motion solely through

16

of Officer Trammell about what he did with the shirt or the whereabouts of the shirt at the time of trial. *Columbus v. State*, 270 Ga. at 664-665 (4); see *Childs v. State*, 287 Ga. 488, 494 (7) (696 SE2d 670) (2010) (The defendant failed to present any evidence at the motion for new trial hearing to show that his defense was prejudiced because his trial counsel failed to interview a certain witness before trial.).[10] Accordingly, Williams cannot prevail on this alleged error.

4. Williams also contends that the trial court abused its discretion in denying his motion for a mistrial, arguing that the State violated his constitutional rights by allegedly failing to preserve the green shirt, which he characterizes as a "material" piece of evidence. The record shows that, immediately after the trial court denied his motion for a continuance, Williams' counsel moved for a mistrial, claiming that he had just become aware that the State did not tender the shirt into evidence and that he was "relying on this evidence to be introduced [by the State and was] under the impression it would be introduced or it had been introduced."

---

their briefs.

[10] See also *Martinez v. State*, 289 Ga. 160, 161-162 (2) (b) (709 SE2d 797) (2011) (The defendant failed to show that he was prejudiced by trial counsel's failure to request a continuance so that a witness could be located, because appellate counsel failed to present the witness' testimony during the motion for new trial hearing.).

17

"Whether to grant a mistrial is within the sound discretion of the trial court, and its ruling will not be disturbed absent an abuse of discretion." (Citation and punctuation omitted.) *Shelnutt v. State*, 255 Ga. App. 157, 158 (1) (a) (564 SE2d 774) (2002).

> The State has a constitutional obligation to preserve evidence that might be expected to play a significant role in the suspect's defense. But *the failure to preserve evidence does not constitute a constitutional violation, unless it is shown that the missing evidence was potentially useful to the defense and was destroyed in bad faith on the part of the police.* Accordingly, the prosecution may be penalized if it loses or destroys evidence that could potentially have been helpful to the defense *only* if the defense shows that the evidence was material and that the State acted in bad faith in failing to preserve it. *To be material, the evidence must have had an apparent exculpatory value before it was lost, and be of such a nature that the defendant cannot obtain comparable evidence by other reasonable means.*

(Citations and punctuation omitted; emphasis supplied.) *Blackwood v. State*, 277 Ga. App. 870, 873-874 (2) (627 SE2d 907) (2006).

(a) First, we note that Williams has not shown that the State "failed to preserve" or intentionally destroyed the green shirt. Instead, the record simply shows that the State sent the shirt to the crime lab for testing and that the State did not tender the shirt

18

or any testing results at trial. There is nothing in the record that shows that the shirt has been lost or destroyed. Further, there is nothing in the record to show that Williams ever attempted to arrange for independent testing of the shirt to determine if it might constitute exculpatory evidence.

(b) Second, although Williams argues on appeal that the green shirt was "material and exculpatory to the defense because it was used by several witnesses to identify the shooter," this argument is a gross misrepresentation of the State's identification evidence. In fact, the record shows that *not a single witness* stated that he or she knew Williams was the shooter because he or she recognized him from the green shirt he was wearing. Instead, numerous witnesses told the officers and/or testified at trial that they knew Williams before the shooting and that they recognized him as he ran down the street shooting a handgun; a few of them *also* said that Williams was wearing a green shirt at the time of the shootings. In addition, the lead detective in this case, who was called by the defense, testified that the witnesses reported that they recognized Williams from the neighborhood and described what he was wearing; she specifically denied that any witness said he or she recognized Williams from the shirt he was wearing.

While this evidence shows that the shirt clearly had some *inculpatory* value, Williams failed to present any evidence in the court below to show that the shirt had any apparent *exculpatory* value and, as a result, constituted material evidence for the defense. *Blackwood v. State*, 277 Ga. App. at 874 (2). Nor did Williams present any evidence to show that the State acted in bad faith by failing to regain custody of the shirt after it had been tested by the crime lab. *Lonergan v. State*, 281 Ga. 637, 639 (3) (641 SE2d 792) (2007); *Blackwood v. State*, 277 Ga. App. at 874 (2). Consequently, there is no merit to his claim that the State violated his constitutional rights by failing to preserve material evidence. *Lonergan v. State*, 281 Ga. at 639 (3); *Blackwood v. State*, 277 Ga. App. at 874 (2). It follows that the trial court did not abuse its discretion in denying his motion for a mistrial on that basis. *Lonergan v. State*, 281 Ga. at 639 (3).

*Judgment affirmed. Phipps, P. J., and Dillard, J., concur.*